## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EARL M. WHEBY, JR., Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | JURY TRIAL DEMANDED |
| CYPRESS SEMICONDUCTOR CORPORATION, W. STEVE ALBRECHT, HASSANE EL-KHOURY, OH CHUL KWON, CATHERINE P. LEGO, CAMILLO MARTINO, JEFFREY J. OWENS, JEANNINE SARGENT, and MICHAEL S. WISHART, | ) ) ) ) ) ) ) ) ) | CLASS ACTION |
| Defendants. | ) ) | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action stems from a proposed transaction announced on June 3, 2019 (the "Proposed Transaction"), pursuant to which Cypress Semiconductor Corporation ("Cypress" or the "Company") will be acquired by Infineon Technologies AG ("Parent") and IFX Merger Sub, Inc. ("Merger Sub," and together with Parent, "Infineon").

2.      On June 3, 2019, Cypress's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Infineon.  Pursuant to the terms of the Merger Agreement, Cypress's stockholders will receive $23.85 in cash for each share of Cypress common stock they own.

3.      On July 2, 2019, defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission (the "SEC") in connection with the Proposed Transaction.

4.      The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.  Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Cypress common stock.

9.      Defendant Cypress is a Delaware corporation and maintains its principal executive offices at 198 Champion Court, San Jose, California 95134.  Cypress's common stock is traded on the NasdaqGS under the ticker symbol "CY."

10.     Defendant W. Steve Albrecht is Chairman of the Board of the Company.

11.     Defendant Hassane El-Khoury is President, Chief Executive Officer, and a director of the Company.

12.     Defendant Oh Chul Kwon is a director of the Company.

13.     Defendant Catherine P. Lego is a director of the Company.

14.     Defendant Camillo Martino is a director of the Company.

15.     Defendant Jeffrey J. Owens is a director of the Company.

16.     Defendant Jeannine Sargent is a director of the Company.

17.     Defendant Michael S. Wishart is a director of the Company.

18.     The defendants identified in paragraphs 10 through 17 are collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Cypress (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

20.     This action is properly maintainable as a class action.

21.     The Class is so numerous that joinder of all members is impracticable.  As of May 30, 2019, there were approximately 365,933,848 shares of Cypress common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

22.     Questions of law and fact are common to the Class, including, among others, whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

23.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

24.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

25.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company and the Proposed Transaction*

26.     Cypress is the leader in advanced embedded solutions for the world's most innovative automotive, industrial, smart home appliances, consumer electronics, and medical products.

27.     The Company's microcontrollers, wireless and USB-based connectivity solutions, analog ICs, and reliable, high-performance memories help engineers design differentiated products and get them to market first.

28.     On June 3, 2019, Cypress's Board caused the Company to enter into the Merger Agreement with Infineon.

29.     Pursuant to the terms of the Merger Agreement, Cypress's stockholders will receive

$23.85 in cash for each share of Cypress common stock they own.

30.     According to the press release announcing the Proposed Transaction:

Infineon Technologies AG (FSE: IFX / OTCQX: IFNNY) and Cypress Semiconductor Corporation (NASDAQ: CY) today announced that the companies have signed a definitive agreement under which Infineon will acquire Cypress for US$23.85 per share in cash, corresponding to an enterprise value of €9.0 billion. . . .

Transaction Details

Under the terms of the agreement, Infineon will offer US$23.85 in cash for all outstanding shares of Cypress. This corresponds to a fully diluted enterprise value for Cypress of €9.0 billion. The offer price represents a 46 percent premium to Cypress's unaffected 30-day volume-weighted average price during the period from 15 April to 28 May 2019, the last trading day prior to media reports regarding a potential sale of Cypress.

Cypress will continue its quarterly cash dividend payments until the transaction closes. This includes Cypress's previously announced quarterly cash dividend of US$0.11 per share, payable on July 18, 2019 to holders of record of Cypress's common stock at the close of business on June 27, 2019.

The funding of the acquisition is fully underwritten by a consortium of banks. Infineon is committed to retaining a solid investment grade rating and, consequently, Infineon intends to ultimately finance approximately 30 percent of the total transaction value with equity and the remainder with debt as well as cash on hand. The financial policy to preserve a strategic cash reserve remains in place.

The acquisition is subject to approval by Cypress's shareholders and the relevant regulatory bodies as well as other customary conditions. The closing is expected by the end of calendar year 2019 or early 2020.

Credit Suisse and J.P. Morgan acted as lead financial advisors to Infineon. Bank of America Merrill Lynch also acted as financial advisor. All three banks acted as structuring banks in addition to providing committed financing for the transaction, Bank of America Merrill Lynch in the lead. Kirkland & Ellis LLP and Freshfields Bruckhaus Deringer LLP are acting as legal advisors to Infineon.

Morgan Stanley is acting as exclusive financial advisor to Cypress, and Simpson Thacher & Bartlett LLP is serving as legal counsel.

31.     The Merger Agreement contains a "no solicitation" provision that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.   Section 6.6(a)(i) and 6.6(a)(ii) of the Merger Agreement provide:

> (i) Except as permitted by Section 6.6(b) or Section 6.6(d), during the Interim Period, the Company shall not, and shall cause its Subsidiaries not to and shall direct its and their Representatives not to on behalf of the Company or its Subsidiaries, (A) initiate, solicit or knowingly encourage or facilitate any inquiries with respect to, or the making of, any proposal or offer that constitutes, or would reasonably be expected to lead to, an Acquisition Proposal, (B) engage in, continue or otherwise participate in, any negotiations or discussions concerning, or provide access to its properties, books and records or any confidential information to, any Person in connection within any proposal or offer that constitutes, or would reasonably be expected to lead to, an Acquisition Proposal (other than informing any Person of the existence of the provisions of this Section 6.6), (C) publicly endorse or recommend, or propose publicly to endorse or recommend, any proposal or offer that constitutes, or would reasonably be expected to lead to, an Acquisition Proposal, (D) execute or enter into, any merger agreement, acquisition agreement or other similar definitive agreement or any letter of intent, memorandum of understanding or agreement in principle relating to any Acquisition Proposal (other than an Acceptable Confidentiality Agreement) (an "Alternative Acquisition Agreement") or approve any proposal or offer that constitutes, or would reasonably be expected to lead to, an Acquisition Proposal, (E) withhold, withdraw, qualify, amend or modify (or publicly propose or resolve to withhold, withdraw, qualify, amend or modify) in a manner adverse to Parent, the Recommendation or fail to include the Recommendation in the Proxy Statement; (F) take formal action or make any recommendation in connection with a tender offer or exchange offer relating to securities of the Company other than a recommendation against such offer or a "stop, look and listen" communication by the Company Board pursuant to Rule 14d-9(f) of the Exchange Act; (G) if a tender offer or exchange offer that relates to the securities of the Company is commenced, fail to publicly recommend against acceptance of such tender offer or exchange offer by the stockholders of the Company within ten (10) Business Days after the commencement thereof; (H) following an Acquisition Proposal becoming publicly known, fail to publicly reaffirm the Recommendation within ten (10) Business Days after receipt of a written request by Parent to so reaffirm, provided that the Company and its Representatives shall have no obligation to reaffirm the Recommendation more than once with respect to any publicly known Acquisition Proposal (with modification to the financial terms thereof or any other material term thereof constituting a new Acquisition Proposal); or (I) resolve, publicly propose or agree

to do any of the foregoing (any act described in clauses (C), (D), (E), (F), (G), (H) or this clause (I) (to the extent related to the actions described in the forgoing clauses        (C), (D), (E), (F), (G) or (H)),        a        "Change        of Recommendation"); provided, however, that it is understood and agreed that any determination or action by the Company Board to the extent permitted under Section 6.6(b), Section 6.6(c) or Section 6.6(d) shall not be, and shall not be deemed to be, a breach or violation of this Section 6.6(a) or, in the case of Section 6.6(b), unless a Change of Recommendation has occurred, give Parent a right to terminate this Agreement pursuant to Section 8.1(e)(ii).

(ii) The Company shall, and shall cause its Subsidiaries to and shall direct its and their Representatives to, immediately cease any solicitations, discussions or negotiations with any Person (other than the Parties and their respective Representatives) in connection with any proposal or offer that would constitute, or reasonably be expected to lead to, an Acquisition Proposal, in each case, that exist as of the date hereof, and immediately terminate all physical and electronic data room access previously granted to any such Person or its Representatives. The Company also agrees that it will promptly request each Person (other than the Parties and their respective Representatives) that has prior to the date hereof executed a confidentiality agreement in connection with its consideration of acquiring the Company to return or destroy all confidential information furnished to such Person by or on behalf of the Company or any of its Subsidiaries prior to the date hereof and in accordance with the terms of such confidentiality agreement. Notwithstanding anything to the contrary herein, the Company may grant a waiver, amendment or release under any confidentiality or standstill agreement solely to the extent (A) necessary to allow for a confidential Acquisition Proposal to be made to the Company or the Company Board and (B) the Company Board has determined in good faith, after consultation with its outside legal counsel, that failure to grant such waiver, amendment or release would be inconsistent with its fiduciary duties under applicable Law.

32.        Additionally, the Company must promptly advise Infineon of any proposals or inquiries received from other parties.  Section 6.6(a)(iii) of the Merger Agreement states:

The Company agrees that it will promptly (and in any event within twenty-four (24) hours of the Company's Knowledge of any such event) notify Parent if (A) any expressions of interest, proposals or offers with respect to an Acquisition Proposal are received by, (B) any non-public information is requested to facilitate a proposal or offer that constitutes, or could reasonably be expected to lead to, an Acquisition Proposal from, or (C) any discussions or negotiations are sought to be initiated or continued with the Company or any of its Subsidiaries or any of its or their respective Representatives from any Person (other than Parent) with respect to any proposal or offer that constitutes, or could reasonably be expected to lead to, an Acquisition Proposal, including in such notification a copy (if in writing) of documents or written summary of material terms (if oral) relating to such

expression of interest, proposal, offer or request for information, and the identity of the Person from which such expression of interest, proposal, offer or request for information was received. Except as provided in Section 6.6(d), the Company shall keep Parent reasonably informed, on a prompt basis of the status and material terms of any such expressions of interest, proposals or offers (including any copies (if in writing) of documents or written summaries of material terms (if oral) of any proposed agreements and amendments or modifications thereto, and a copy of any other documents provided by the relevant counterparty relating thereto) and the status of any discussions or negotiations regarding any Acquisition Proposal, and in the case of any material modification to the terms of any Acquisition Proposal, the Company shall notify Parent of such material modification on a prompt basis (and in any event within forty-eight (48) hours of the Company's or any of its Subsidiaries' or any of its or their respective Representatives' knowledge of any such material modification (such period to be reduced to twenty-four (24) hours in the event of any modification to price)).

33.     Moreover, the Merger Agreement contains a "fiduciary out" provision permitting the Board to change its recommendation of the Proposed Transaction under extremely limited circumstances, and grants Infineon a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 6.6(d) of the Merger Agreement provides:

Notwithstanding anything herein to the contrary, at any time prior to obtaining the Company Requisite Vote, the Company Board may in response to its receipt of an Acquisition Proposal that did not result from a material breach of this Section 6.6 (x) make a Change of Recommendation (other than the actions described in clause (D) of the definition of Change of Recommendation) or (y) terminate this Agreement pursuant to Section 8.1(d)(ii) to enter into a definitive written agreement providing for such Acquisition Proposal if:

(i) the Company Board has determined in good faith, after consultation with the Company's financial advisors and outside legal counsel that (A) such Acquisition Proposal would, if consummated, result in a Superior Proposal and (B) the failure to make such Change of Recommendation or terminate this Agreement pursuant to Section 8.1(d)(ii) to enter into a definitive written agreement providing for such Acquisition Proposal, as the case may be, would reasonably be likely to be inconsistent with its fiduciary duties under applicable Law (provided that the actions of the Company Board in making such determination and such determination shall not in themselves constitute a Change of Recommendation or a termination of this Agreement);

(ii) the Company delivers to Parent a written notice (a "Company Notice") at least four (4) Business Days in advance advising Parent of such determination under Section 6.6(d)(i), which Company Notice shall specify the identity of the

party making a Superior Proposal and the material terms and conditions thereof and include an unredacted copy of the Superior Proposal and any proposed draft Alternative Acquisition Agreement for such Superior Proposal and any related documents, including financing documents, to the extent provided by the relevant party in connection with the Superior Proposal (provided that the giving of a Company Notice and actions of the Company Board in authorizing and disclosing (to the extent legally required) such notice shall not in themselves constitute a Change of Recommendation or a termination of this Agreement); and

(iii) at or after 11:59 p.m. San Jose, California time, on the fourth Business Day immediately following the date the Company Notice is delivered to Parent (such period of time, the "Notice Period"), the Company Board again makes a determination described under Section 6.6(d)(i) after (A) if requested by Parent, the Company made its Representatives reasonably available during the Notice Period for the purpose of engaging in discussions and negotiations with Parent and its Representatives (to the extent Parent desires to negotiate) regarding a possible amendment to this Agreement and (B) taking into account in good faith any written proposals made by Parent during the Notice Period, if any, that if accepted by the Company would become binding on Parent; provided that if, following the date the Company Notice is delivered but prior to the Company Board making a Change of Recommendation or terminating this Agreement pursuant to Section 8.1(d)(ii), the financial or other material terms of the relevant Acquisition Proposal are materially amended or modified, then the Company will deliver to Parent a new Company Notice pursuant to Section 6.6(d)(ii), except that the Notice Period with respect to such new Company Notice for the purposes of this Section 6.6(d)(iii) shall instead end at 11:59 p.m. San Jose, California time, on the second Business Day immediately following the date such new Company Notice is delivered to Parent (but no such new Company Notice will shorten the initial Notice Period).

34.     The Merger Agreement also provides for a "termination fee" of $330,000,000 payable by the Company to Infineon if the Individual Defendants cause the Company to terminate the Merger Agreement.

***The Proxy Statement Omits Material Information, Rendering It False and Misleading***

35.     Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

36.     As set forth below, the Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

37.     First, the Proxy Statement omits material information regarding the Company's financial projections.

38.     For each set of projections, the Proxy Statement fails to disclose: (i) all line items used to calculate non-GAAP gross profit, non-GAAP operating income, Adjusted EBITDA, non-GAAP net income, non-GAAP diluted EPS, non-GAAP gross margin, and unlevered free cash flow; and (ii) a reconciliation of all non-GAAP to GAAP metrics.

39.     The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

40.     Second, the Proxy Statement omits material information regarding the analyses performed by the Company's financial advisor in connection with the Proposed Transaction, Morgan Stanley & Co. LLC ("Morgan Stanley").

41.     With respect to Morgan Stanley's Public Trading Comparables Analysis, the Proxy Statement fails to disclose the outstanding shares of Cypress common stock on a fully-diluted basis.

42.     With respect to Morgan Stanley's Discounted Equity Value Analysis, the Proxy Statement fails to disclose: (i) the range of price to earnings multiples applied by Morgan Stanley in the analysis and its basis for applying such multiples; and (ii) the individual inputs and assumptions underlying the discount rate of 11.1%.

43.     With respect to Morgan Stanley's Discounted Cash Flow Analysis, the Proxy Statement fails to disclose: (i) all line items used to calculate unlevered free cash flow; (ii) the terminal values used by Morgan Stanley in the analysis; (iii) the individual inputs and assumptions

underlying the discount rate ranging from 9.4% to 11.1% and the perpetual growth rates of 2% to 3%; and (iv) the outstanding shares of Cypress common stock on a fully-diluted basis.

44.     With respect to Morgan Stanley's Precedent Transactions Analysis, the Proxy Statement fails to disclose: (i) the individual multiples for the transactions observed by Morgan Stanley in the analysis; and (ii) the premiums paid in the transactions.

45.     With respect to Morgan Stanley's Equity Research Analysts' Future Price Targets analysis, the Proxy Statement fails to disclose: (i) the price targets for Cypress common stock; (ii) the sources thereof; and (iii) the individual inputs and assumptions underlying the discount rate of 11.1%.

46.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

47.     Third, the Proxy Statement omits material information regarding Morgan Stanley.

48.     The Proxy Statement fails to disclose the timing and nature of the past services Morgan Stanley provided to Cypress.

49.     The Proxy Statement also fails to disclose the amount of compensation Morgan Stanley has received or will receive for acting as administrative agent with respect to credit facilities of Cypress.

50.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

51.     The omission of the above-referenced material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy

Statement: (i) Background of the Merger; (ii) Recommendation of the Board and Reasons for the Merger; (iii) Opinion of Morgan Stanley & Co. LLC; and (iv) Certain Financial Projections.

52.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

<u>COUNT I</u>

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Cypress**

53.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

54.     The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Cypress is liable as the issuer of these statements.

55.     The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

56.     The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

57.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.   In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

58.     The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

59.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

60.     Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

**Claim for Violation of Section 20(a) of the 1934 Act
Against the Individual Defendants**

61.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

62.     The Individual Defendants acted as controlling persons of Cypress within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Cypress and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

63.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

64.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged

herein, and exercised the same.  The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in the making of the Proxy Statement.

65.     By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

66.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for

plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby requests a trial by jury on all issues so triable.

Dated: July 8, 2019                          **RIGRODSKY & LONG, P.A.**

                                         By:   */s/ Gina M. Serra*
                                               Brian D. Long (#4347)
**OF COUNSEL:**                                Gina M. Serra (#5387)
                                               300 Delaware Avenue, Suite 1220
**RM LAW, P.C.**                               Wilmington, DE 19801
Richard A. Maniskas                            Telephone: (302) 295-5310
1055 Westlakes Drive, Suite 300                Facsimile: (302) 654-7530
Berwyn, PA 19312                               Email: bdl@rl-legal.com
Telephone: (484) 324-6800                      Email: gms@rl-legal.com
Facsimile: (484) 631-1305
Email: rm@maniskas.com                         *Attorneys for Plaintiff*